# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

    *Plaintiff,*

vs.

JUVENAL BAUTISTA-MEZA,

    *Defendant.*

Case No. 14-10016-01-EFM

## MEMORANDUM AND ORDER

This matter comes before the Court on Defendant Juvenal Bautista-Meza's ("Defendant") Motion to Suppress (Doc. 14) and Motion to Sever (Doc. 15). For the reasons stated below, the Court grants in part and denies in part the Motion to Suppress and denies the Motion to Sever.

### I.  Factual and Procedural Background

In 2012, the Finney County Sheriff's Department began investigating an individual, then known to them as Ruben Castillo ("Castillo"), for the possession and sale of methamphetamine. During the course of the Department's investigation, at least three confidential informants ("CI") claimed to have seen methamphetamine at Castillo's residence. Law enforcement also learned that Castillo often drove a blue Pontiac Grand Prix, which was registered to Castillo's roommate, Sergio Colunga ("Colunga").

As a result of their investigation, on April 30, 2013, investigators arranged a controlled buy of methamphetamine between a CI and Castillo. The CI made contact with a blue Grand Prix in a parking lot, entered the vehicle, and then subsequently left the scene, having purchased suspected methamphetamine. Law enforcement and the CI positively identified the driver of the vehicle as Castillo. The purchased substance was later confirmed to be 1.24 grams of methamphetamine. Following this controlled buy, law enforcement continued its investigation into Castillo's alleged drug distribution activity.

On September 19, 2013, law enforcement received information that Castillo's real name was Juvenal Bautista ("Bautista"). A records check showed that Juvenal Bautista had prior arrests and convictions for felony offenses in California and had previously been deported. Law enforcement later positively identified Castillo as Juvenal Bautista.

On September 25, 2013, Finney County Sheriff's Corporal Scott Chalmers ("Corporal Chalmers") observed a blue Grand Prix driving down Maple Street in Garden City, Kansas. Corporal Chalmers noted that the window tint of the vehicle appeared to be darker than allowed by state law and initiated a traffic stop. The driver of the vehicle identified himself as Ruben Castillo. Having recently learned of the investigation into Castillo's activities and of the recent identification of Castillo as Juvenal Bautista, Corporal Chalmers checked records for Juvenal Bautista and learned that he had a suspended license. Castillo eventually admitted that his real name was Juvenal Bautista and was subsequently asked to exit the vehicle. Corporal Chalmers requested permission to search the vehicle, which Defendant granted. Corporal Chalmers first conducted a dog sniff of the vehicle, which produced no results. He then began to search the interior of the vehicle and uncovered a small empty capped syringe in the center console. He also discovered a hidden hollow compartment in the area normally occupied by the passenger air

bag. Inside the compartment was a second empty capped syringe and a loaded Inter Arms .357 Magnum. The vehicle was towed to a law enforcement facility and Defendant was arrested.

As a result of the traffic stop and discovery of the syringes and gun, Sergeant Jeff Steele ("Sergeant Steele"), the officer assigned to the investigation of Defendant, applied for and was granted a search warrant of Defendant's residence. While executing the warrant, officers seized a small bag of methamphetamine found in Defendant's bedroom, as well as digital scales, syringes, ammunition, and other drug paraphernalia. The officers also noticed that the house was equipped with a video surveillance system.

On February 13, 2014, a federal grand jury returned a four-count indictment charging Defendant with: (1) distribution of methamphetamine,[1] (2) being a felon in possession of a firearm, (3) aggravated illegal reentry, and (4) being an alien in possession of a firearm. Defendant filed a Motion to Suppress (Doc. 14) and a Motion to Sever Count I of the indictment (Doc. 15). This Court conducted oral argument on both motions on May 15, 2014.

## II. Analysis

**Motion to Suppress**

Defendant challenges both the traffic stop and the search of his residence, asserting that the traffic stop was not supported by reasonable suspicion and the search warrant obtained to search his residence lacked probable cause. Specifically, with regard to the search warrant, Defendant alleges that the information contained in the accompanying affidavit was at least five months old, making the information stale. Defendant also alleges that the warrant's affidavit

---

[1] Count I relates solely to the controlled buy of methamphetamine on April 30, 2013, between Defendant and the CI and does not involve the methamphetamine found in Defendant's residence during the execution of the September 2013 search warrant.

failed to contain clear statements that Defendant had recently conducted any drug sales or that he had ever conducted drug sales from his home. While this Court does not agree with Defendant's claims regarding the traffic stop, it does agree with his claims concerning the search warrant for his residence.

**A. Traffic Stop**

In analyzing the constitutionality of a traffic stop under the Fourth Amendment, a court must apply the "reasonable suspicion" standard set forth in *Terry v. Ohio*.[2] This standard applies to a review of the reasonableness of a traffic stop "regardless of whether the stop is based on probable cause or on some lesser suspicion."[3] To justify a *Terry* stop, the detaining officer must have, based on all the circumstances, a "'particularized and objective basis for suspecting' the person stopped of 'criminal activity.'"[4]

The analysis of a traffic stop under *Terry* is two-fold. First, the court must determine whether the officer's stop of the vehicle was "justified at its inception."[5] A traffic stop meets this standard if an officer has: (1) probable cause to believe a traffic violation has occurred, or (2) a reasonable articulable suspicion that a particular motorist has violated any of the traffic or equipment regulations of the jurisdiction.[6] For reasonable suspicion to exist, an officer "'need not rule out the possibility of innocent conduct;' he or she simply must possess 'some minimal

---

[2] *United States v. Winder*, 557 F.3d 1129, 1133 (10th Cir. 2009) (citing *United States v. Botero-Ospina*, 71 F.3d 783, 786 (10th Cir. 1995) (en banc)).

[3] *United States v. Holt*, 264 F.3d 1215, 1230 (10th Cir. 2001) (en banc).

[4] *Winder*, 557 F.3d at 1133 (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)).

[5] *Id.*

[6] *Id.*

level of objective justification' for making the stop."⁷ "Evidence falling 'considerably short' of a preponderance satisfies this standard.'"⁸

Here, the government argues that Corporal Chalmers had an objectively reasonable suspicion that the vehicle that Defendant was driving violated the Kansas statute regulating the tinting of vehicle windows. Under K.S.A. § 8-1749a(a)(3),

> [n]o motor vehicle required to be registered in this state and which is operated on the highways of this state shall be equipped with one-way glass or any sun screen device . . . that do not meet the following requirements: . . . (3) the total light transmission shall not be less than 35% when a sun screening device is used in conjunction with safety glazing materials or other existing sun screening devices.

A violation of this statute is a misdemeanor.⁹

On September 25, 2013, Corporal Chalmers observed a blue Grand Prix operating on the roadway and noted that, based on his many years of experience, the window tint appeared to be darker than allowed by law. He decided to stop the vehicle based on this perceived traffic violation. Corporal Chalmer's suspicion was indeed later confirmed when a window tint transparency test revealed that the windows permitted only 22.6% of light through, well below the 35% required by Kansas law.

The Kansas Court of Appeals has explained that an officer's "reasonable suspicion" that a vehicle's windows violate the window-tint law is "limited to the facts available to him . . . prior to the traffic stop: 'Neither the concepts of probable cause nor articulable suspicion would require that an officer have tint meter readings before making a stop for a window tint

---

⁷ *Id.*

⁸ *Id.*

⁹ K.S.A. § 8-1749a(f).

violation.'"[10] Furthermore, the Tenth Circuit has stated that, when reviewing a motion to suppress, it is not the court's role "to decide whether the present facts are adequate to affirm a conviction under the applicable . . . traffic statute, but to inquire solely as to whether the facts are adequate to form an objectively reasonable suspicion that a traffic statute has been violated."[11]

Here, the Court is satisfied that, based on his observation and years of experience in the field, Corporal Chalmers had reasonable suspicion to stop Defendant's vehicle for a violation of the window tint statute. Therefore, Defendant's motion to suppress the traffic stop is denied.

**B. Search Warrant of Residence**

With regard to the search warrant of his residence, Defendant argues that not only was the information contained in the accompanying affidavit stale but also that the affidavit did not contain clear statements that Defendant had participated in any recent drug transactions or that Defendant conducted drug sales from his home. In response, the government concedes that the information regarding the controlled buy in April 2013 was stale at the time the search warrant was issued in September 2013, but argues that this information was refreshed by the evidence collected during the traffic stop. The government also argues that the warrant's affidavit contained sufficient evidence to establish a nexus between the sale of methamphetamine and Defendant's residence. The Court disagrees.

---

[10] *United States v. Beltran-Palafox*, 731 F. Supp. 2d 1126, 1146 (D. Kan. 2010) (quoting *State v. Kirk*, 40 Kan. App. 2d 817, 819 (Kan. Ct. App. 2008)).

[11] *Id.* at 1146-47 (quoting *Vercher*, 358 F.3d at 1260) (internal quotations omitted).

### 1. Staleness

"Probable cause to search cannot be based on stale information that no longer suggests that the items sought will be found in the place to be searched."[12] "However, the determination of whether information is stale depends on the nature of the crime and the length of criminal activity, not simply the number of days that have elapsed between the facts relied upon and the issuance of the warrant."[13] "Where the affidavit recites a mere isolated violation it would not be unreasonable to imply that probable cause dwindles rather quickly with the passage of time."[14] "But when an individual is suspected of engaging in criminal activity that is continuous and ongoing, the passage of time becomes less critical."[15]

Here, the information contained in the affidavit is as follows. In late 2012, the Finney County Sheriff's Department received a tip that an individual by the name of Ruben Castillo was selling methamphetamine. In February 2013, an SI informed Sergeant Steele that Castillo received his methamphetamine in the mail. This same SI claimed to have purchased methamphetamine from Castillo at his residence. In April 2013, a CI informed Sergeant Steele that he too had purchased methamphetamine from Castillo (although the CI did not make any mention of doing so at Castillo's residence) and that Castillo kept a gun on his person. On April 30, 2013, the Department arranged a controlled buy between this CI and Castillo. The purchase took place in the blue Grand Prix in a parking lot. The next day, the same CI notified the

---

[12] *United States v. Giesy*, 2014 U.S. Dist. LEXIS 36481, at *6 (D. Kan. Mar. 7, 2014) (quoting *United States v. Snow*, 919 F.2d 1458, 1459 (10th Cir. 1990)).

[13] *Id.* (quoting *United States v. Myers*, 106 F.3d 936, 939 (10th Cir. 1997)) (concluding that a gap of five months between the tip and the search warrant did not render the information stale when drug activities were demonstrated to be continuous and ongoing).

[14] *Id.* at *7 (quoting *United States v. Johnson*, 461 F.2d 285, 287 (10th Cir. 1972)).

[15] *Id.* (citing *United States v. Mathis*, 357 F.3d 1200, 1206-07 (10th Cir. 2004)).

Sheriff's Department that Castillo claimed to have just received a new shipment of methamphetamine and had agreed to make an additional sale to the CI. On May 6 and 7, 2013, Sergeant Steele observed the blue Grand Prix parked at Castillo's residence. On September 19, 2013, Sergeant Steele confirmed that the individual he knew as Castillo was actually Defendant. On September 25, 2013, Corporal Chalmers made the traffic stop and discovered the two syringes and the .357 Magnum.

While it is certainly possible, as the government argues, for stale information to be "refreshed," that simply is not what happened in this case.[16] Aside from the CI's information that Defendant had offered to make another sale of methamphetamine to him *after* the controlled buy on April 30, 2013, the affidavit contained no actual information of ongoing drug activity. The fact that the blue Grand Prix was seen parked at the residence on two occasions in May 2013 and the fact that the traffic stop revealed a firearm is not enough to actually refresh the sale of narcotics.

### 2. Nexus

Nor does the affidavit provide an adequate nexus between the sale of drugs and Defendant's residence. The Warrant Clause of the Fourth Amendment provides that "no warrants shall issue but upon probable cause, supported by Oath or affirmation."[17] A warrant affidavit must set forth particular facts and circumstances underlying the existence of probable

---

[16] *See United States v. Harris*, 2008 U.S. Dist. LEXIS 87487, at *8 (D. Kan. Oct. 27, 2008) (holding that although the historical information related to the defendant's criminal history and prior complaints of drug trafficking was likely stale, the recent complaint of drug trafficking that took place six week before the search, combined with three controlled purchases of cocaine from the defendant's residence, one within 48 hours of the affidavit, adequately refreshed that information).

[17] *Franks v. Delaware*, 438 U.S. 154, 164 (1978).

cause, thereby allowing the issuing magistrate to make an independent evaluation of the matter.[18] "When reviewing a determination of probable cause for a search warrant, the Court must consider the totality of the circumstances and determine whether the affidavit establishes a fair probability that contraband or evidence of a crime will be found in a particular place."[19] "The Court does not require hard evidence or personal knowledge of illegal activity to link an individual's suspected unlawful activity to his home."[20] Rather, "a sufficient nexus is established once an affidavit describes circumstances which would warrant a person of reasonable caution in the belief that the articles sought are at a particular place."[21] A magistrate's decision to issue a warrant is entitled to great deference.[22]

Again, the search warrant for Defendant's residence was based primarily on information that: (1) Defendant received methamphetamine in the mail, (2) a source of information ("SI") claimed to have purchased methamphetamine numerous times from Defendant at the residence, (3) information from a CI that Defendant always carried a pistol on his person, (4) Defendant participated in a controlled buy with a CI on April 30, 2013, (5) the blue Grand Prix was registered to Colunga, (6) on at least one occasion, Colunga and Defendant were seen riding in the vehicle together, and (7) the vehicle, at the time of traffic stop, contained two syringes and a .357 Magnum revolver. Further, Sergeant Steele stated in the affidavit that, from his training and

---

[18] *Id.*

[19] *United States v. Ellis*, 2012 U.S. Dist. LEXIS 174367, at *5 (D. Kan. Dec. 10, 2012) (citing *United States v. Roach*, 582 F.3d 1192, 1200 (10th Cir. 2009)).

[20] *Id.* at *6 (citing *United States v. Biglow*, 562 F.3d 1272, 1279 (10th Cir. 2009)) (internal quotations omitted).

[21] *Id.*

[22] *United States v. Gonzales*, 399 F.3d 1225, 1228 (10th Cir. 2005).

approximately ten years of drug enforcement experience, he knew that "[m]ethamphetamine dealers commonly store their drugs for sale, proceeds from the sale of controlled substances and other drug related paraphernalia at their place of residence."[23]

While the affidavit makes clear that law enforcement had been watching and investigating Defendant for quite some time prior to the September 25, 2013, traffic stop, and while it is clear that the affidavit clearly links *Defendant* to the residence, it provides almost *no* information connecting the sale of methamphetamine, or any other illegal substances, to the residence. In fact, the only connection between such a sale and the residence is information obtained from an SI at some point *prior* to the controlled buy in April 2013, that he had purchased methamphetamine "numerous times from [Defendant] at his residence."[24] The affidavit says nothing about any recent illegal transactions taking place at Defendant's residence. In fact, the affidavit does not mention *any* actual sale of illegal narcotics by Defendant after the controlled buy in April.

Furthermore, it is important to note that no drugs were actually found in the vehicle. Although Corporal Chalmers found two small syringes, he testified at oral argument that they were empty. Corporal Chalmers also admitted that the syringes were of the type that could be used for legitimate medical purposes. The government relies heavily on the discovery of the gun in the vehicle. However, the presence of a gun by itself does not mean that Defendant was a drug dealer or that he kept drugs at his residence. Otherwise, by the government's logic, every person found to be in possession of a firearm is likely to be a drug dealer. The Court therefore fails to find any clear nexus between the items discovered at the traffic stop and the sale of

---

[23] Doc. 14, Attachment 1, at 6.

[24] Doc. 14, Attachment 1, at 4.

methamphetamine at Defendant's home. The search warrant is constitutionally deficient in failing to make an adequate showing of probable cause.

### 3. Good Faith Exception to the Exclusionary Rule

"Searches conducted pursuant to a warrant are favored, and, as such, the magistrate's determination that probable cause exists is entitled to great deference."[25] Similarly, law enforcement officers are generally not required to second-guess a magistrate's decision in granting a warrant.[26] These principles comport with the exclusionary rule's purpose of "deterring improper police action, rather than punishing errors made by magistrates."[27] Consequently, the United States Supreme Court adopted the "good faith" principle, holding that "evidence obtained pursuant to a warrant that is later found to be defective is not properly excluded when the warrant is relied on by the officers in objective good faith."[28]

The deference given to such warrants, however, "is not boundless."[29] The Supreme Court has recognized four exceptions to reliance on the good faith doctrine:

> (1) where the judge issued the warrant on a deliberately or recklessly false affidavit; (2) where the judge abandoned his neutral and detached judicial role; (3) where the affidavit is so lacking in indicia of probable cause that it would be unreasonable for the officer to rely on it; and (4) where the warrant is so facially deficient and fails to particularize that an officer cannot reasonably believe it to be valid.[30]

---

[25] *Gonzales*, 399 F.3d at 1228 (internal citations omitted).

[26] *See id.* (citing *United States v. Tuter*, 240 F.3d 1292, 1300 (10th Cir. 2001)).

[27] *Id.* at 1229 (citing *United States v. Leon*, 468 U.S. 897, 916 (1984)).

[28] *Id.*

[29] *Leon*, 468 U.S. at 914.

[30] *United States v. Kulatunga*, 2010 U.S. Dist. LEXIS 103383, at *5 (D. Kan. Sept. 29, 2010 ) (citing *Leon*, 468 U.S. at 923).

Defendant argues that the affidavit was simply devoid of probable cause.[31] While the government relies on the fact that law enforcement officers are entitled to rely upon the probable cause determination of a neutral and detached magistrate, the Court notes that officers "are also required to exercise their own professional judgment."[32] In this context, good faith is determined by considering whether a "reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization."[33] Under this standard, "when the underlying documents are devoid of factual support, an officer cannot be said to have relied on them in good faith."[34]

Here, Sergeant Steele's affidavit listed the address of the place to be searched in the caption and described both the residence and the items to be seized with particularity. However, the affidavit is largely silent as to an explanation of how the residence was linked to suspected criminal activity or why Sergeant Steele thought the items to be seized would be found in the residence. Rather, aside from an SI's very stale information that he had purchased methamphetamine from Defendant at the residence, and that the blue Grand Prix had been seen at the residence in recent days, the only facts before the judge were that Defendant was a convicted felon and a .357 Magnum was found in a hidden compartment in a vehicle in which Defendant was the only occupant. The only real attempt at a connection was Sergeant Steele's statement that "[m]ethamphetamine dealers commonly store their drugs for sale, proceeds from

---

[31] The Court notes that counsel, during oral argument, cited exception four, that the warrant was so facially deficient that the executing officer could not possibly have relied on it. However, based on the *balance* of Defendant's argument, and because counsel never made a *facial* attack on the warrant, the Court presumes that counsel was, in fact, arguing exception three.

[32] *Gonzales*, 399 F.3d at 1230.

[33] *Id.* (quoting *Leon*, 468 U.S. at 922 n.23).

[34] *Id.*

the sale of controlled substances and other related drug paraphernalia at their place of residence." While the Tenth Circuit has held that courts may properly rely on an officer's experience in finding probable cause, Sergeant Steele's generically stated experience was not supported by any facts establishing that Defendant's residence was linked to the sale of methamphetamine.

"For good faith to exist, there must be *some* factual basis connecting the place to be searched to the defendant or suspected criminal activity."[35] When, as in this case, this connection is absent, the affidavit and resulting warrant are "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."[36] Exclusion is appropriate in these circumstances because "reasonably well-trained officers, exercising their own professional judgment, will be able to recognize the deficiency."[37] This Court therefore concludes that the warrant was "so lacking" and the officer's reliance upon it was not objectively reasonable. This failure cannot be overcome by a simple assertion of good faith. As such, Defendant's motion to suppress any items found during the search of Defendant's residence is granted.[38]

**Motion to Sever**

Defendant also seeks to sever Count I of the indictment from the remaining three counts. Under Rule 8(a) of the Federal Rules of Criminal Procedure, joinder of offenses is permitted if

---

[35] *Id*. at 1231.

[36] *Leon*, 468 U.S. at 923.

[37] *Gonzales*, 399 F.3d at 1231.

[38] The Court pauses here to note the following: Defendant sought suppression of the search warrant for his house, the Government vigorously opposed suppression, and the Court has ruled on the motion, ultimately suppressing the search. The Court remains at a loss, however, as to *why* any of this matters, since nothing found during the search of Defendant's residence is even referred in any of the charges in the Indictment. At the conclusion of the hearing, the Court inquired whether granting the suppression would have *any* impact on *any* of the charges against Defendant. Apparently, it would not.

the offenses "are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan."[39] A court must "construe Rule 8 broadly to allow liberal joinder to enhance the efficiency of the judicial system."[40] However, a court must keep in mind that Rule 14(a) allows separation of offenses if joinder "appears to prejudice a defendant or the government."[41] "Prejudicial joinder occurs under Rule 14 when an individual's right to a fair trial is threatened or actually deprived."[42] In such circumstances, "the court may order separate trials of counts . . . or provide any other relief that justice requires."[43] To succeed on a motion to sever, a defendant must show that a denial of severance would "result in actual prejudice to his defense, and that this prejudice would outweigh the expense and inconvenience of separate trials."[44]

In support of his motion, Defendant notes that Count I involves the April 30, 2013, controlled buy of 1.24 grams of methamphetamine whereas Counts II, III, and IV involve the firearm recovered at the September 25, 2013, traffic stop and Defendant's immigration status. According to Defendant, joinder of count one with the other counts would allow a jury to learn of Defendant's prior criminal record as well as his immigration status, both of which are highly prejudicial to Defendant. The government disagrees and argues that proper jury instructions would cure any potential prejudice to Defendant.

---

[39] *United States v. Johnson*, 130 F.3d 1420, 1427 (10th Cir. 1997); *see also* FED. R. CRIM. P. 8(a).

[40] *Johnson*, 130 F.3d at 1427 (citing *United States v. Janus Indus.*, 48 F.3d 1548, 1557 (10th Cir. 1995)).

[41] FED. R. CRIM. P. 14(a).

[42] *Johnson*, 130 F.3d at 1427.

[43] FED. R. CRIM. P. 14(a).

[44] *United States v. Hutchinson*, 573 F.3d 1101, 1025 (10th Cir. 2009) (internal citations omitted).

The Court agrees with the government's response and is convinced that the charges are, in fact, related. Defendant has failed to establish how allowing joinder of these claims would result in "actual prejudice to his defense" as is required to succeed on a motion to sever. The April 2013 controlled buy allowed law enforcement to determine Castillo's true identity as Juvenal Bautista. This identification informed the traffic stop and Corporal Chalmers' discovery that Defendant was a felon in possession of a firearm who had been previously deported. The only way law enforcement learned of Defendant's true identity and could therefore charge him with Counts II, III, and IV was because of information learned as a result of the controlled buy. As such, joinder is appropriate.

Furthermore, Defendant's concern that a jury would learn of his prior criminal record and immigration status with regard to Count I will be alleviated by the Court's instructions that require the jury to consider each count independently. "[L]imiting instructions are ordinarily sufficient to cure potential prejudice."[45] Therefore, Defendant's motion to sever Count I is denied.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Suppress (Doc. 14) is hereby **GRANTED IN PART** and **DENIED IN PART**. Defendant's Motion to Sever (Doc. 15) is hereby **DENIED**.

---

[45] *Id*. at 1026 (quoting *United States v. Hardwell*, 80 F.3d 1471, 1487 (10th Cir. 1996)).

**IT IS SO ORDERED**.

Dated this 23rd day of May, 2014.

                                                           ERIC F. MELGREN
                                                           UNITED STATES DISTRICT JUDGE